# In the United States Court of Federal Claims

No. 25-515
(Filed Under Seal: June 27, 2025)
Reissued: July 16, 2025

```
* * * * * * * * * * * * * * * * * * * *
                                      *
ADVANCED TECHNOLOGY                   *
SYSTEMS COMPANY,                      *
                                      *
                Plaintiff,            *
                                      *
        v.                            *
                                      *
THE UNITED STATES,                    *
                                      *
                Defendant,            *
                                      *
and                                   *
                                      *
FORWARD SLOPE, INC.,                  *
                                      *
                Defendant-Intervenor. *
                                      *
* * * * * * * * * * * * * * * * * * * *
```

*Philip E. Beshara*, with whom were *Carla Weiss*, *Robert Nichols*, *Logan Kemp*, and *Annie Hudgins*, Nichols Law, all of Washington, D.C., for Plaintiff.

*Matthew P. Roche*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, with whom were *Albert S. Iarossi*, Assistant Director, *Patricia M. McCarthy*, Director, *Yaakov M. Roth*, Acting Assistant Attorney General, all of Washington, D.C., for Defendant, and *Jessica K. Eddy*, Associate Counsel, Department of the Navy, of Washington, D.C., of counsel.

*Tara D. Hopkins*, with whom were *Jonathan Shaffer*, *Zachary Prince*, and *Jesse Cardinal*, Haynes and Boone LLP, all of Tysons Corner, VA, for Defendant-Intervenor.

## OPINION AND ORDER

**SOMERS**, Judge.

In the boardgame Battleship, players take turns guessing the location of their opponent's ships in an effort to destroy their opponent's fleet and win the game. To be successful in the game, players must carefully pick the shots fired at their opponent's fleet on offense while

simultaneously attempting to not reveal how closely their opponent's shots miss the player's ships on defense. In this procurement, the Department of the Navy ("the Navy") has seemingly mastered the defensive skills, but not the offensive skills, of a Battleship player. In evaluating proposals for the maritime surveillance contract at issue here, the Navy utilized vague and conflicting past performance criteria to make an award decision while simultaneously failing to provide any explanation for the decision it made. In other words, in contrast to how a skilled Battleship player carefully picks his shots on offense, the Navy carelessly chose ambiguous words and utilized an unclear past performance rating system in this procurement. Conversely, just as a successful Battleship player conceals how close his opponent is to hitting his ships on defense, the Navy did not reveal any clear rationale for its award decision. While players should abide by the adage "loose lips sink ships" when playing Battleship, an agency should not utilize a lips-sealed approach in documenting its evaluation of the award of a contract, especially when the evaluation criteria on which the agency relies for award are all but clearly stated.

## BACKGROUND

### A.    Factual Background

On February 2, 2023, the Navy issued Solicitation number N00024-23-R-5310, providing the parameters for an "unrestricted full and open competition for a Cost-Plus-Fixed-Fee, Firm-Fixed-Price, and Cost (no fee) procurement to provide" the Arab Republic of Egypt with a Nationwide Maritime Surveillance System ("NMSS") via a foreign military sale. Tab 172 at Administrative Record ("AR") 6335; Tab 33 at AR 1111. The NMSS provides "security information required by the [Egyptian Navy] to make decisions on the defense and security of its maritime boundary, natural resources, and ports." Tab 172 at AR 6335. The Navy sought a contractor to provide "surface search near shore, underwater detection, tracking, and monitoring capacity along the Mediterranean Sea and Red Sea coastal borders of Egypt." *Id.*

The solicitation in this procurement stated that "[t]he Government plans to award a single contract resulting from this solicitation to the responsible Offeror whose proposal offers the best value to the Government." Tab 33 at AR 1220. The solicitation established five factors, listed in relative order of importance, under which each offeror would be evaluated: Factor 1: Technical Approach; Factor 2: Management Approach; Factor 3: Past Performance; Factor 4: Small Business Utilization; and Factor 5: Total Evaluated Cost/Price. *Id.* at AR 1221. According to the solicitation, Factors 1–4, referred to as the "non-cost" factors, "are significantly more important than Factor 5." *Id.* However, to the extent that "competing proposals approach[ed] parity in the non-cost/price factors, Factor 5 [was to] increase in importance." *Id.* The non-cost factors were to be assigned adjectival ratings based on a rating system designated for each factor. *Id.* The Court will provide brief background on each evaluation factor relevant to this protest before discussing the Navy's award decision.

#### 1.    Factor 1: Technical Approach and Factor 2: Management Approach

Under Factor 1: Technical Approach, the Navy would evaluate each offeror's proposal to "assess the extent to which the Offeror's proposal demonstrates an adequate approach, understanding, capabilities and experience to perform the entirety of the work under this

solicitation." *Id.* at AR 1221. Furthermore, the Navy would "assess the degree to which the Offeror's proposal demonstrates a thorough understanding of the solicitation requirements for, and technologies involved with, the efforts under this solicitation." *Id.*

Under Factor 2: Management Approach, the Navy would evaluate "the degree to which the approach . . . details the Offeror's plan in meeting [outside the continental United States ("OCONUS")] activities and subcontractor requirements and the potential cost and performance risks as well as plans for mitigating those risks." *Id.* Additionally, the Navy would evaluate "the extent to which the approach cites relevant experience executing in a security cooperation environment." *Id.*

The solicitation provided the following adjectival rating system for Factor 1 and Factor 2:

| Adjectival Ratings for Factors 1 and 2 | |
|---|---|
| Adjectival Rating | Description |
| Outstanding | Proposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low. |
| Good | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate. |
| Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| Unacceptable | Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable. Proposal is unawardable. |

*Id.* at AR 1225 (color rating column omitted). As stated above, Factor 1 is the most important and Factor 2 is the second-most important evaluation factor for this solicitation. *See id.* at AR 1221.

### 2. Factor 3: Past Performance

The solicitation states that there are two aspects to the past performance evaluation under Factor 3. The first is "Relevance," in which the Navy would "evaluate the Offeror's past performance to determine how relevant the Offeror's recent efforts are to the requirements included in this solicitation." *Id.* With regard to relevancy, the solicitation defined "recency" as "Contracts/Orders performed within the past five (5) years from the date of proposal submission," and "relevant" past performance as "experience similar in technical nature, scope, dollar value, and complexity to this effort." *Id.*

To be evaluated under this evaluation factor, each offeror would have to submit past performance records detailing its performance in past contracts. The solicitation provided that the Navy would assess offerors' past performance records for relevancy under Factor 3 pursuant to the following rating system:

| Relevancy of Past Performance Ratings Under Factor 3 | |
|---|---|
| Rating | Definition |
| Very Relevant | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| Relevant | Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires. |
| Somewhat Relevant | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |
| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

*Id.* at AR 1226. For purposes of this solicitation, the Navy defined "magnitude" as "dollar value." *Id.* at AR 1222. The solicitation did not expressly define the terms "scope" or "complexities this solicitation requires."

In addition, "[w]ith respect to relevancy," the solicitation states that "past performance of greater relevancy will typically be a stronger predictor of future success and have more influence on the past performance confidence assessment than past performance of lesser relevance" and that "[d]irect experience with DoD commands accomplishing tasking relevant to the SOW requirements will be considered more favorably." *Id.*

The second aspect of the past performance evaluation was "Confidence," through which the Navy would "determine how well the Offeror performed on [its submitted] relevant, recent contracts." *Id.* The solicitation states that "[b]ased on an evaluation of the totality of each Offeror's past performance record and considering recency, relevancy, and quality assessments, the [Navy] will assign one (1) overall performance confidence assessment rating" based on the ratings offerors receive in the "Relevancy" evaluation. *Id.* The solicitation provided that the Navy would assess offerors' submissions under Factor 3 for performance confidence pursuant to the following rating system:

| Performance Confidence Assessment Ratings Under Factor 3 | |
|---|---|
| Rating | Description |
| Substantial Confidence | Based on the Offeror's recent/relevant performance record, the Government has a high expectation that the Offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the Offeror's recent/relevant performance record, the Government has a reasonable expectation that the Offeror will successfully perform the required effort. |
| Limited Confidence | Based on the Offeror's recent/relevant performance record, the Government has a low expectation that the Offeror will successfully perform the required effort. |
| No Confidence | Based on the Offeror's recent/relevant performance record, the Government has no expectation that the Offeror will be able to successfully perform the required effort. |
| Neutral Confidence | No recent/relevant performance record is available, or the Offeror's performance record is so sparse that no meaningful confidence assessment |

| | | | |
|---|---|---|---|
| | rating can be reasonably assigned.  The Offeror may not be evaluated favorably or unfavorably on the factor of past performance. | | |

*Id.* at AR 1226.  Importantly for this protest, the solicitation noted that "[i]n the case of an offeror without a record of relevant past performance, or for whom information on past performance is not available or is sparse, the Offeror will not be evaluated favorably or unfavorably on past performance and will receive a Neutral rating." *Id.* at AR 1222.  Factor 3 is the third most important evaluation factor. *See id.* at AR 1221.

### 3. Factor 4: Small Business Utilization and Factor 5: Total Evaluated Cost/Price

Under Factor 4: Small Business Utilization, the solicitation would assess the extent to which each offeror's proposal "meets and/or exceeds the 8% of the total subcontracted amount to small business" requirement. *Id.* at AR 1222.  Under Factor 5: Total Evaluated Cost/Price, the Navy would "evaluate the Offeror's proposed costs and prices by calculating a Total Evaluated Cost/Price (TEC/P) that the [Navy] [would] use in making the award determination." *Id.* at AR 1223.

### 4. The Navy's Award Decision

The solicitation established a deadline of June 30, 2023, by which five offerors timely submitted proposals: Advanced Technology Systems Company, Inc. ("ATSC"), the protestor here; Forward Slope, Inc. ("FSI"), the awardee here; ███████████████████████. Tab 172 at AR 6335.  Within the Source Selection Decision Document ("SSDD"), the Source Selection Authority ("SSA") summarized the findings of the Source Selection Evaluation Board ("SSEB") and Cost/Price Analysis Team ("CPAT") reports, on which the SSA relied to make an award decision, in the following chart:

| | | ATSC | FSI | | |
|---|---|---|---|---|---|
| Technical Approach | ███ | Outstanding | Outstanding | ███ | ███ |
| Management Approach | ███ | Good | Good | ███ | ███ |
| Past Performance | ███ | Satisfactory Confidence | Neutral Confidence | ███ | ███ |
| SB Utilization | | Outstanding | Outstanding | | |
| Proposed Price | ███ | ███ | $96,527,790 | ███ | ███ |
| Evaluated Price | ███ | ███ | $96,798,109 | ███ | ███ |

Tab 173 at AR 6359.  The SSA opined that "[w]hile ATSC offers an overall superior approach in the non-cost/price factors due to its superior approach in Factor 2, . . . the price premium with ATSC's proposed approach does not merit the additional price when compared to FSI's proposed approach." *Id.* at AR 6360.  Moreover, the SSA stated that "[s]ince Factor 5 increases in importance as competing proposals approach parity in the non-cost/price factors, the SSAC determined that the unique benefits ATSC provides does not warrant the ███ % price premium

when compared to FSI's proposal." *Id.* After justifying why the Navy would not pay the price premium associated with other offerors' proposals, the SSA stated that "FSI's proposal . . . offers the best value." *Id.* The Navy accordingly awarded FSI the contract and notified ATSC that it was not selected for contract award on February 21, 2025. *See* Tab 110 at AR 1391–93.

## B.    Procedural History

On March 21, 2025, ATSC filed its complaint. ECF No. 1. A few days later, on March 26, 2025, FSI moved to intervene in this action, ECF No. 9, and the Court granted FSI's motion that day, ECF No. 11. On April 18, 2025, ATSC filed its motion for judgment on the administrative record ("MJAR"). ECF No. 26. On April 29, 2025, FSI and the government filed their responses to ATSC's motion and their own cross-motions for judgment on the administrative record. ECF No. 31; ECF No. 32. On May 6, 2025, ATSC filed a reply in support of its motion and response to the other parties' cross-motions, ECF No. 35, and FSI and the government filed their replies on May 13, 2025. ECF No. 36; ECF No. 37. The Court held oral argument on the parties' motions on May 21, 2025. This case is now ripe for adjudication.

## DISCUSSION

## A.    Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act, provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement . . . ." 28 U.S.C. § 1491(b)(1). In such actions, the Court is to "review the agency's decision pursuant to the standards set forth in section 706 of title 5." *Id.* § 1491(b)(4). To succeed in a bid protest, a protestor must make two showings. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). First, a protestor must show error, meaning that the agency violated the standards set forth in section 706 of the Administrative Procedures Act ("APA"). *Id.*; *see also* 5 U.S.C. § 706(2)(A) (requiring the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). Second, a protestor must demonstrate that such error was prejudicial. *Bannum, Inc.*, 404 F.3d at 1351.

To demonstrate that an agency's actions were in error, a protestor must establish that the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Put differently, a procurement decision may be set aside if the protestor proves that "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (quoting *PGBA, LLC v. United States*, 389 F.3d 1219, 1225 n.4 (Fed. Cir. 2004)). Additionally, to demonstrate entitlement to relief, a protestor must establish not only that the agency violated the APA standard, but also that such

violation prejudiced the protestor. *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it."); *see also Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 996–97 (Fed. Cir. 2021) ("In particular, the challenger of agency action generally bears the burden of showing that an error was harmful—that is, that it was prejudicial.").

Bid protests are generally decided on cross-motions for judgment on the administrative record, pursuant to Rule 52.1 of the Rules of the U.S. Court of Federal Claims ("RCFC"). Under RCFC 52.1, the Court must "make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc.*, 404 F.3d at 1354. Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record. *See id.* at 1355–56. Instead, in reviewing cross-motions for judgment on the administrative record, "this Court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence contained in the administrative record." *Golden IT, LLC v. United States*, 157 Fed. Cl. 680, 687 (2022) (citing *Bannum Inc.*, 404 F.3d at 1356–57).

## B.    Analysis

ATSC advances seven reasons why the Court should grant its MJAR. ECF No. 26. First, ATSC alleges that the Navy conducted a flawed best value tradeoff in contravention of the solicitation and the FAR. *Id.* at 11–16. Second, ATSC argues that the Navy arbitrarily and disparately deemed two of ATSC's past performance references "Not Relevant." *Id.* at 26–30. Third, ATSC contends that the Navy improperly disregarded the "Very Relevant" past performance reference of ATSC's proposed subcontractor. *Id.* at 30–31. Fourth, ATSC maintains that the Navy unreasonably based ATSC's "Satisfactory" confidence rating on two "cherry-picked" comments from a Contractor Performance Assessment Report ("CPAR"). *Id.* at 31–32. Fifth, ATSC claims that the Navy entirely disregarded the Factor 1 evaluation requirement of "experience to perform the entirety of the work" in its award of the contract. *Id.* at 21–23. Sixth, ATSC insists that the Navy irrationally evaluated and underrated ATSC's proposal under Factor 2 while simultaneously inflating FSI's proposal under that factor. *Id.* at 23–26. Seventh, ATSC argues that the Navy irrationally evaluated FSI as "Outstanding" under Factor 1. *Id.* at 17–21. Finally, based on the preceding seven errors ATSC alleges, ATSC argues that injunctive relief is warranted in this case. *Id.* at 33–35. The Court addresses these arguments in turn.

### 1.    The Navy Erred by Conducting a Flawed Best Value Tradeoff in Contravention of the Solicitation and the FAR.

Before discussing the parties' arguments, the Court recounts the SSA's rationale for her award decision. The SSA stated that the Source Selection Advisory Council ("SSAC") determined that Factor 3 "was not a discriminator when determining best value as ATSC and ███ both had Satisfactory Confidence and FSI, ███, and ███ had Neutral Confidence. Neutral Confidence cannot be evaluated favorably or unfavorably." Tab 173 at AR 6359–60. The SSA further stated:

> I received and considered reference (b) [the SSAC report], which documents the SSAC's recommendation to select FSI for award of the EN NMSS requirements. I independently reviewed each offeror's proposal as well as the SSEB, reference c [SSEB Report], and CPAT, reference d, and SSAC, reference b, reports. In my independent judgment, I concur with the SSAC that the FSI proposal represents the best value to the Government, in accordance with the criteria set forth in reference (a) [the Solicitation]. The SSAC's recommendation is based on its consideration of references (c) and (d) [CPAT Report], as well as its independent review of each Offeror's proposal. *I adopt in whole the analysis and conclusions in references (b), (c), and (d).*

*Id.* at AR 6358 (emphasis added). In other words, the SSA fully adopted the reasoning and conclusions of the SSAC, SSEB, and CPAT reports in her decision to award FSI the contract. Importantly, this includes the SSAC's reasoning that "[s]ince offerors with neutral ratings cannot be rated favorably or unfavorably on the factor of past performance, FSI, █████████ past performance does not impact the trade-off decision."[1] Tab 172 at AR 6354.

With this background established, ATSC argues that the Navy's award of the contract to FSI was fundamentally flawed because the Navy "adopted a legally erroneous premise—namely, that because FSI lacked relevant past performance and received a 'Neutral Confidence' rating, Factor [3]: Past Performance could *not* serve as a discriminator in the [best value] tradeoff" and that such premise violates "FAR 15.305, the Solicitation's stated evaluation criteria, and black-letter law." ECF No. 26 at 11 (emphasis in original).[2] Put succinctly, ATSC essentially argues that the SSA's determination that past performance would not be a discriminator in the best value determination is contrary to law.

The government's flagship argument in response is that the Navy did not fail to consider ATSC's past performance rating but instead determined that, for this procurement, a Satisfactory Confidence and a Neutral Confidence rating would be considered as equal. *See* ECF No. 32 at 16 ("[T]he SSA simply concluded that a Neutral rating would not be considered a more favorable or less favorable rating than a Satisfactory rating during the best value tradeoff determination,

---

[1] While the quoted language reflects the SSAC report's intended meaning, the SSAC report originally included a typo, leaving off the word "not" in the quoted language. *See* Tab 172 at AR 6354 ("Since offerors with neutral ratings cannot be rated favorably or unfavorably on the factor of past performance, FSI, █████████ past performance does impact the trade-off decision."). However, as the Navy concedes and is obvious given the context, "this is a typo in the SSAC and should have said 'does not' impact the trade-off decision. This is validated in the SSAC on page 22 'For Factor 3, the SSAC determined that the evaluation factor is not a discriminator in determining best value . . .' and in the Source Selection Decision Document, which also makes it clear that Factor 3 was not a discriminator." Tab 192 at AR 6836 (alteration in original) (quoting Tab 172 at AR 6354).

[2] ATSC wrote in its brief that the Navy's decision was irrational in its "Factor 2: Past Performance" evaluation. ECF No. 26 at 11. However, given the context of ATSC's argument and the terms of the solicitation, the Court construes such language as a typo referring to Factor 3: Past Performance.

thus ensuring that an offeror with a Neutral past performance rating would not be 'evaluated favorably or unfavorably on the factor of past performance.'" (quoting Tab 33 at AR 1226)).

However, the government's response is not supported by the record and thus fails for at least three reasons.  First, the SSA never stated that a Neutral rating would not be considered more or less favorably than a Satisfactory rating; all she said was that "the evaluation factor was not a discriminator when determining best value."  Tab 173 at AR 6359.  Because the SSA never articulated the rationale that the government proclaims she used, the government's argument appears to constitute the *post hoc* rationale of government attorneys and not the contemporaneous decision-making criteria of Navy procurement officials.  It is a "foundational principle of administrative law" that judicial review of agency action is limited to "the grounds that the agency invoked *when it took the action*."  *Michigan v. Env't Prot. Agency*, 576 U.S. 743, 758 (2015) (emphasis added).  Stated differently, when reviewing an agency decision, the Court must look to the decision-making process contemporaneous to the agency's decision, not *post hoc* justifications crafted for subsequent litigation.

In an attempt to avoid the *post hoc* label, the government points to debriefing documents that state that "[w]hile the Government may determine that a Satisfactory Confidence past performance rating is worth more than a Neutral Confidence rating, the SSAC and SSA did not for this procurement based on their review of the past performance records."  Tab 192 at AR 6836.  But the government cannot rely on the justification provided in a post-award debrief to attempt to supply an unprovided contemporaneous rationale for a decision made at the time of award.  *Fort Carson Support Servs. v. United States*, 71 Fed. Cl. 571, 591–92 (2006) ("But while such debriefings might, on occasion, yield useful party admissions, any new explanations of the evaluation process made post-award are the sort of '*post hoc* rationalizations' that courts reject when offered by the government in bid protest cases." (quoting *Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 343 (2004)).  By definition, a post-award debrief takes place after the award of a contract and is addressed to disappointed bidders.  In other words, at the time of debriefing, the overall tone of the agency-bidder relationship begins to shift from a cooperative competition to a potentially adversarial dispute, as disappointed bidders seek explanation from the procuring agency as to why they were not selected for award.  In many instances (including the instant protest), a debrief can be viewed as a precursor to an impending protest; thus, an agency may be using the debrief as a final attempt to offer an explanation to ward off a potential protest ground that is raised by a disappointed offeror's debrief questions.  Because the government only asserts *post hoc* rationale for a critical question regarding the Navy's best value determination, the government's argument does not reflect the Navy's contemporaneous rationale for its award decision and accordingly fails.[3]

Second, even if the government's debrief-based argument did not constitute *post hoc* rationalization, the Navy's justification for its best value determination is wholly conclusory.  A

---

[3] Even if a debrief could reflect the contemporaneous decision-making of an agency at the time of procurement, the debrief here expressly contradicts the government's argument that the Navy essentially treated Satisfactory and Neutral Confidence ratings equally.  *See* Tab 192 at AR 6836 ("A 'Neutral Confidence' rating is not treated as equal to all other past performance ratings.").

conclusory rationale is not sufficient for purposes of APA review, as a Court must "know what [an agency's] decision means before the duty becomes [the Court's] to say whether it is right or wrong." *United States v. Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 294 U.S. 499, 511 (1935). Here, the debrief, on which the government solely relies, states that Neutral Confidence ratings would be considered equal to Satisfactory Confidence ratings for purposes of this procurement. *See* Tab 192 at AR 6836. But the debrief fails to provide any explanation for that decision, merely remarking that while the Navy could have determined that "a Satisfactory Confidence past performance rating is worth more than a Neutral Confidence rating," it did not "for this procurement based on [its] review of the past performance records." *Id.* Lacking from these sentences is any explanation of what, in the Navy's review of the past performance records, led to the decision to consider Neutral and Satisfactory Confidence ratings equally. Although the Navy did not need to exhaustively explain why Neutral and Satisfactory ratings would be considered equally, some explanation for that choice was required. But because the Navy provided no explanation at all for its decision not to treat a Satisfactory Confidence past performance rating more favorably than a Neutral Confidence rating, the Court has no way to "know what [the Navy's] decision means" and, therefore, cannot say whether that decision "is right or wrong" under the APA. *Pac. R.R. Co.*, 294 U.S. at 511. Such explanation-barren agency decisions cannot be sustained.

Third, even if the explanation provided in the debrief and relied on by the government here was neither *post hoc* rationalization nor impermissibly conclusory, the explanation directly conflicts with the pre-award and contemporaneous-with-award documents in the record. For example, the SSA, who adopted "in whole the analysis and conclusions" of the SSAC, stated that "the SSAC determined that the [past performance] evaluation factor was *not a discriminator* when determining best value as ATSC and ▓▓▓ both had Satisfactory Confidence and FSI, ▓▓▓, and ▓▓▓▓ had Neutral Confidence." Tab 173 at AR 6358, 6359 (emphasis added). Nowhere in her report did the SSA say she was treating Satisfactory and Neutral Confidence ratings equally. She only stated that the past performance evaluation factor was "not a discriminator when determining best value." *Id.* at AR 6359. The only semblance of an explanation for the SSA's reasoning comes in the next sentence of the SSA report: "Neutral Confidence cannot be evaluated favorably or unfavorably." *Id.* at AR 6359–60. The Court can either read this sentence as floating alone from the sentence that precedes it (inserted into the paragraph for no apparent reason) or, more rationally, can read the sentence to be an apparently disjointed explanation of the rationale for the SSA's decision. The Court chooses the latter course and joins the sentences by inserting the word "because" to read: "[T]he evaluation factor was not a discriminator when determining best value as ATSC and ▓▓▓ both had Satisfactory Confidence and FSI, ▓▓▓, and ▓▓▓▓ had Neutral Confidence" *because* "Neutral Confidence cannot be evaluated favorably or unfavorably." *Id.* at AR 635960. While this is a more natural reading of the two sentences, to the extent that this is the reason for the SSA's decision, such a decision cannot stand because the reasoning is invalid.

As ATSC argues, even though the solicitation states that Neutral Confidence ratings "may not be evaluated favorably or unfavorably," Tab 33 at AR 1226, "this instruction applies to the evaluation of the offeror that receives the 'Neutral' rating—not to the relative comparison among all offerors' past performance records in the best value determination," ECF No. 35 at 6. The

government expressly agrees with this contention. ECF No. 37 at 5–6.[4] Yet, both the document on which the SSA relied to reach her conclusions and the SSA report itself seem to read the solicitation's instructions as applicable to the relative comparison among all offerors' past performance records, and not to the evaluation of the offeror that receives the Neutral rating. Tab 172 at AR 6354 ("*Since offerors with neutral ratings cannot be rated favorably or unfavorably on the factor of past performance*, FSI, ███████████ past performance does [not] impact the trade-off decision. ATSC and ███ were determined to have the same confidence rating." (emphasis added)); Tab 173 at AR 6359–60 ("[T]he evaluation factor was not a discriminator when determining best value as ATSC and ███ both had Satisfactory Confidence and FSI, ███, and ███ had Neutral Confidence. Neutral Confidence cannot be evaluated favorably or unfavorably."). This explanation confirms ATSC's theory.

Moreover, it is well established that agencies may treat Satisfactory Confidence ratings more favorably than Neutral Confidence ratings. *Bahr. Mar. & Mercantile Int'l BSC (C) v. United States*, 118 Fed. Cl. 462, 480 n.13 (2014) ("While an agency may not assign an unfavorable rating to an offeror based on its lack of a past performance history, it is entitled to treat a high past performance rating (like BMMI's) as worth more than a Neutral past performance rating (like OFI's)."); *Def. Base Servs., Inc. v. United States*, 147 Fed. Cl. 424, 440 (2020) ("DBSI concedes that the Air Force was permitted, under the terms of the Solicitation and the FAR, to treat ASRCC's Satisfactory Confidence rating more positively than a Neutral Confidence rating."); *see also Precision Images, LLC v. United States*, 79 Fed. Cl. 598, 625 (2007) ("Here, a rating of 'Satisfactory Confidence' is listed above—and is therefore ranked higher than—ratings of 'Unknown Confidence,' 'Little Confidence,' and 'No Confidence' in the [solicitation]."). Thus, the Navy's decision to treat Satisfactory and Neutral Confidence ratings equally—because it seemingly believed it was required to do so—was incorrect according to the relevant caselaw.

The parties expended much effort in their briefs arguing why certain ratings were justified or not justified or why a certain offeror achieved a higher rating than another. *See, e.g.*, ECF No. 26 at 17–32; ECF No. 31 at 27–31; ECF No. 32 at 26–40. But these arguments are akin to ships passing in the night. Regardless of the justification for the assigned ratings, the Navy never explained that it would consider Satisfactory and Neutral Confidence ratings equally or why it did so. In mathematical terms, the Navy effectively explained both sides of the equation (the definitions of "Satisfactory" and "Neutral" confidence) but did not explain the symbol in the middle of the equation itself. Why was Satisfactory Confidence "equal to" Neutral Confidence? Or, conversely, why was Satisfactory Confidence not "greater than" Neutral Confidence"? Without an answer to these questions in the award decision and the documents relied upon to make that decision, the Navy fails to provide a rational basis for its award decision.

---

[4] "ATSC contends that the solicitation's instruction that Neutral Confidence ratings 'shall not be evaluated favorably or unfavorably,' Tab No. 33 at AR 1226, 'applies to the evaluation of the offeror that receives the 'Neutral' rating—not to the relative comparison among all offerors' past performance records in the best value determination.' *We agree*." ECF No. 37 at 5–6 (citation omitted) (emphasis added).

In sum, it may very well be that the Navy considered Satisfactory and Neutral Confidence ratings equally. But the documents included in the administrative record do not provide an explanation of this evaluation decision. For this reason, the Navy's decision to treat Satisfactory Confidence and Neutral Confidence equally (apparently because it believed it was required to do so) is irrational and thus the government's flagship argument sinks without a flare. No matter the deference the government thinks the Navy is entitled to in this bid protest, there must be contemporary explanations for the Navy's procurement decisions in the record for the Court to properly review under the APA standard. Without such explanations, the Court cannot properly assess the Navy's procurement decisions. *See Sec. Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can it be expected to chisel that which must be precise from what the agency has left vague and indecisive.").

As ATSC has established error in this procurement, the Court, as it must, turns to whether the error was prejudicial. ATSC argues that this error was prejudicial because "[h]ad the Agency abided by the Solicitation, ATSC would have received the award over FSI, as the tradeoff would have reflected material advantages for ATSC across two of the four non-price evaluation factors—which combined were 'significantly more important' than price . . . ." ECF No. 26 at 15 (quoting Tab 33 at AR 1221). The government counters by arguing that ATSC's argument "simply assumes that, had the SSA given more weight to ATSC's Satisfactory past performance confidence rating compared to FSI during the tradeoff analysis, that additional weight, combined with its Factor 2 rating, would have been sufficient to overcome its nearly $█ million price premium" and that there "is no support for this assumption." ECF No. 37 at 7–8.

To establish prejudice in a post-award bid protest, the protestor must show that it "there was a 'substantial chance' it would have received the contract award" but for the alleged error in the procurement process. *Bannum*, 404 F.3d at 1353 (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)). "[T]here is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision." *Sys. Stud. & Simulation*, 22 F.4th 994, 998 (Fed. Cir. 2021). Instead, "[t]he protestor must show prejudice under the usual standard. The Supreme Court has noted that, at least in some contexts, prejudice will be easily shown because the circumstances will make prejudice readily apparent." *Id.* (citing *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009)).

Here, the solicitation makes clear that the non-cost factors are "significantly more important" than the price of an offeror's proposal. Tab 33 at AR 1221. Of the three non-cost factors, ATSC's proposal was superior under Factor 2, Tab 173 at AR 6360 ("ATSC offers an overall superior approach in the non-cost/price factors due its superior approach in Factor 2 . . . ."), and very likely would have been the top offeror for Factor 3 had the Navy not erroneously determined that Factor 3 was not a discriminator in the best value tradeoff. ATSC received a Satisfactory Confidence rating based on its two "Very Relevant" past performance records. Tab 171 at AR 6291, 6294. In comparison, █████, the only other offeror that received a Satisfactory Confidence rating, had only two "Relevant" past performance records. *Id.* at AR 6281–82. If the Navy correctly deemed ATSC and █████ superior to the other offerors, which only received "Neutral Confidence" ratings, ATSC and █████ would be the top two offerors under Factor 3, with ATSC likely the top offeror for this factor. And between ATSC and ████, the price

of ATSC's proposal was nearly $███ million less than that of ███████ proposal.  *See* Tab 173 at AR 6359 (showing ATSC's total evaluated price of $██████████ and ████████ total evaluated price of $██████████).  If ATSC's proposal was superior to ██████ under Factor 2, at least equal (if not more highly rated) under Factor 3, and almost $██ million cheaper than ██████ proposal, then ATSC had a "substantial chance" to receive the contract over ████.  Furthermore, if ATSC's proposal would have prevailed over FSI's proposal in two of the four non-cost factors (Factor 2 and Factor 3), which by the terms of the solicitation were significantly more important than price, and its price was only approximately ███ % higher than that of FSI's, *see id.* (showing ATSC's total evaluated price of $██████████ and FSI's total evaluated price of $██████████), ATSC had a "substantial chance" to be awarded the contract over FSI but for the errors in this procurement, *see Bannum*, 404 F.3d at 1353 (quoting *Info. Tech. & Applications Corp.*, 316 F.3d at 1319).

Therefore, the Court concludes that ATSC has met its burden of demonstrating that the Navy's irrational decision to treat Satisfactory and Neutral Confidence ratings equally without proper explanation constitutes prejudicial error.

### 2. The Navy Irrationally Evaluated Two of ATSC's Past Performance References as "Not Relevant" Under Factor 3.

ATSC asserts two arguments regarding the Navy's "Relevancy" evaluation of ATSC's proposal under Factor 3.  First, ATSC argues that the Navy irrationally excluded two of ATSC's FMS border surveillance contracts in contravention with the Navy's "own findings that both ATSC efforts aligned with nearly all performance requirements" in the Statement of Work.  ECF No. 26 at 26.  Specifically, ATSC contends that the Navy irrationally excluded from consideration ATSC's contracts performed in ██████ and ██████.  *Id.* at 26–27.  Second, ATSC asserts that the Navy "disparately held ATSC's more aligned, higher-value references to one standard," while holding another offeror's references, which were "less-aligned [and] lower-value," to another.  *Id.* at 29.

The government counters that to demonstrate disparate treatment here, ATSC must show that the Navy "unreasonably evaluated aspects of its proposal that were 'substantively indistinguishable or nearly identical [to] those contained in other proposals.'"  ECF No. 32 at 31 (quoting *Ascendant Servs., LLC v. United States*, 160 Fed. Cl. 275, 289 (2022) (alteration in original) (quoting *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020))).  According to the government, "the substantially indistinguishable standard is important, because unless two (or more) proposals are substantively indistinguishable, the Court could exercise 'free reign to second-guess the agency's discretionary determinations.'"  *Id.* at 32 (quoting *Ascendant Servs. LLC*, 160 Fed. Cl. at 289 (quoting *Off. Design Grp.*, 951 F.3d at 1373)).  Although the Court agrees with the propositions cited by the government regarding the need for proposals to be substantially indistinguishable for a disparate treatment argument to prevail, in this protest it would be impossible for ATSC to develop, and for the Court to implement, the "substantively indistinguishable" standard for a disparate treatment analysis because the solicitation's rating system for past performance references, and the Navy's application of that rating system to the proposals, is indecipherable.

The solicitation states that the Navy would evaluate offerors' proposals under Factor 3 by rating offerors' past performance references in accordance with the "Relevancy" and "Performance Confidence" rating charts included above. *See* Tab 33 at AR 1226. While at first glance the criteria within the "Relevancy" chart may seem clear, closer inspection reveals significant overlap between ratings. For example, an offeror's past performance reference will be deemed "Somewhat Relevant" if the "[p]resent/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires." *Id.* However, an offeror's past performance reference will earn a "Not Relevant" rating if the "[p]resent/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires." *Id.* In other words, what separates a "Somewhat Relevant" rating from an a "Not Relevant" rating is the fact that the offeror's performance effort involved "some" of the scope, magnitude of effort, and complexities the solicitation requires, rather than "little to none" of those aspects. But what is the difference between *some*—"a certain amount; a little"[5]— and *little*—"small in amount, number, or degree"[6]—with regard to the scope, magnitude of effort, and complexities the solicitation requires? It is impossible for the Court to determine what the quantitative difference is between such vague and overlapping terms, given the limited explanation the Navy provided when assigning relevancy ratings in this procurement (a topic that will be discussed below).

The Navy's explanations for the past performance ratings assessed to each offeror further illustrate the lack of consistency in the past performance rating criteria listed in the "Relevancy" chart. The Navy distinguished between ratings by using words such as "little" or "difference" or "similarity" with no discernable rhyme or reason of the consequences of each characterization. For example, the Navy deemed ATSC's $█ million █████ contract "Not Relevant" because "[w]hile this past performance has some of the scope, . . . the size and complexity involved in this past performance record is substantially less than what is required by this solicitation." Tab 171 at AR 6293. In contrast, the Navy deemed █████ $█ million █████ contract "Somewhat Relevant" because "[w]hile it performed some of the scope required by this solicitation, the complexity and magnitude is less than what is required under this solicitation by this subcontractor." *Id.* at AR 6329–30. Vague words such as "substantially less" and "less" do not shed light on the difference between the "little to none" and "some" language in the "Relevancy" past performance rating chart. Even if the size and complexity of ATSC's █████ contract were "substantially less" than what the solicitation required, ATSC's █████ contract could, by definition, have "some" of the size and complexities the solicitation requires, thereby meriting a "Somewhat Relevant" instead of a "Not Relevant" rating. As this example illustrates, the vague words used in the Navy's rating system are consistently inconsistent.

Continuing this streak of unclear explanation, the Navy deemed █████ $█ million █████ contract "Somewhat Relevant" because "[w]hile the past performance effort did have similarity of scope, the SSEB determined the magnitude, and complexity are less when compared to the requirements of the solicitation. The scale of this solicitation is significantly larger than what was performed under this past performance reference." *Id.* at AR 6328. Yet, the Navy found █████ $█ million █████████ contract

---

[5] *Some*, OXFORD ENGLISH DICTIONARY (2d ed. 1989).
[6] *Little*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (4th ed. 2009).

"Not Relevant" because it "was responsible for designing and installing an expansion to current ████████ telecom infrastructure, which is similar in scope to this solicitation. However, due to the difference in magnitude and complexity, this past performance record is deemed not relevant." *Id.* at AR 6329. The Navy's varying use of descriptors such as "less," "difference," "substantially less," and "similar" further exemplifies the incoherent rationale behind the "Relevancy" ratings.

Perhaps most puzzling of all, the Navy found ████ $█ million ████████████ ██████████████████ contract "Very Relevant" because "[a]lthough the magnitude of this effort was significantly less than this solicitation, based on the size and complexity of the subcontract, the past performance record is deemed very relevant." *Id.* at AR 6294. This explanation admits that the magnitude of the reference is "significantly less than this solicitation," yet the reference was still deemed "Very Relevant." *Id.* The Court cannot even begin to square how ████████ reference is "Very Relevant," despite its magnitude being "significantly less," with how ████████ and ████████ references were "Somewhat Relevant" with a magnitude that was only "less" than what the solicitation requires.

As the above illustrates, the Navy's past performance rating system and accompanying rationale are incomprehensible; therefore, ATSC could not even begin to make a disparate treatment argument that is compliant with the "substantively indistinguishable" standard proffered by the government. How could ATSC understand what the ratings were based on, to attempt to establish that its proposal was substantially indistinguishable from that of any other offeror regarding relevancy? The ratings assessed by the Navy are all over the place, making it impossible for ATSC and now the Court to determine the rationale for the ratings assessed. Therefore, ATSC's failure to develop an unequal treatment claim compliant with the "substantively indistinguishable" standard is not fatal to its claim here. To the contrary, the only clear takeaway from the Navy's entirely unclear rating system and ratings is that an agency cannot defeat a disparate treatment claim regarding offeror ratings by making its rating system and ratings impossible to decipher.

Because the Navy relied on this incomprehensible rating system to evaluate offerors' proposals under Factor 3 and relied on those Factor 3 ratings in awarding FSI the contract, the Navy committed prejudicial error on this count. Any increase in the relevancy ratings for ATSC's proposal may have increased its overall rating on past performance thereby further increasing ATSC's chance of award of the contract.

### 3. The Navy Arbitrarily Disregarded the "Very Relevant" Past Performance of ATSC's Proposed Subcontractor in its Factor 3 Evaluation.

ATSC submitted four past performance references for the "Relevancy" evaluation under Factor 3. *See* Tab 171 at AR 6291–95. ████ submitted four as well. *See id.* at 6280–83. Within the four past performance references ATSC submitted, two of those references pertain to the same ████ contract, ████████████████, highlighting the tasks completed by ATSC as the prime contractor and ████████ as a subcontractor on that contract. *Id.* at AR 6291, 6294. The SSEB deemed both these contracts "Very Relevant." *Id.* Similarly, within the four past performance references ████ submitted, two of those references pertain to the same contract, "████████

15

██████████████ ,"[7] showcasing the work performed by ████ as the prime contractor and ████████ as a subcontractor on that contract.  *Id.* at AR 6281–82.  The SSEB deemed both these contracts "Relevant."  *Id.*

As discussed above, the Navy, through the SSA who adopted the SSEB's findings, assessed ATSC and ████ with "Satisfactory Confidence" and all other offerors with "Neutral Confidence" in its Factor 3 "Performance Confidence" evaluation. Tab 172 at AR 6353.  The SSAC summarized the SSEB's findings by stating that "████ had two relevant past performance references and 2 not relevant past performance references.  While ATSC had two very relevant past performance records, these two records was based on the same contract; where ATSC performed as the prime contractor and its proposed subcontractor performed as a subcontractor under that past performance reference." *Id.* at AR 6353–54.  The SSEB and SSAC ultimately concluded that ATSC and ████ earned the same performance confidence rating. *Id.* at AR 6354.

ATSC argues that the Navy "held against ATSC the fact that its subcontractor's past performance reference is for the same 'Very Relevant' contract where ATSC was the prime contractor" and that in contrast, "the SSAC did not criticize another offeror, ████, for its two relevant references being based on the same contract." ECF No. 26 at 30.  The government responds by stating that "[b]y any fair reading of the SSAC's allegedly offending observation that ATSC's two Very Relevant ratings involved work on the same contract, the SSAC was simply documenting a reason (among others) why an offeror with two Very Relevant past performance submissions received only an overall confidence rating of Satisfactory."  ECF No. 32 at 38.  In other words, the government concedes that the SSAC assessed ATSC with a "Satisfactory Confidence" rating because, among other reasons, ATSC and its subcontractor performed on the same contract submitted as a past performance reference.

Even if the government did not concede this point, there is no plausible reason for the SSAC to mention this issue other than as a reason to at least, in part, justify the decision to give ATSC a "Satisfactory Confidence" rating.  Why would the SSAC "simply document" the fact that ATSC's two "Very Relevant" past performance records were based on the same contract if not to explain the rating ATSC received?  Within the context of the paragraph in which this "observation" sits, this sentence has a negative implication, demonstrating the Navy's disparate treatment of ATSC's and ████ past performance references.

The Navy essentially allowed the ████████████████ contract to count as two past performance references for ████ even though ████ and ████████ both performed on that contract while at the same time counting contract number ████████████ as one past performance reference for ATSC because ATSC and ████████ both performed on that contract. Disparate treatment cannot be more apparent.  The Navy may not reduce ATSC's past performance rating, which contains two "Very Relevant" past performance references, to "Satisfactory Confidence" because those references pertain to the same contract while at the same time not treating ████ references, which contain two "Relevant" entries pertaining to the

---

[7] Because the contract number was not provided in the AR, the Court refers to this contract by its provided title.  *See* Tab 171 at AR 6281.

same contract, in the same manner. Such disparate treatment constitutes an irrational agency procurement decision.

ATSC argues that this error was prejudicial because "[t]he result of this flawed assessment was that the Agency erroneously concluded there was not a high expectation that ATSC will successfully perform the required effort, leading to a 'Satisfactory' confidence rating rather than the warranted 'Substantial' confidence rating." ECF No. 26 at 31. The government retorts that, in any event, ATSC cannot establish prejudice here, "as ATSC received the same Satisfactory Confidence rating as ███, and the SSA determined that past performance would not be a discriminatory factor in determining best value." ECF No. 32 at 39. But, as established above, the SSA's determination that past performance would not be a discriminator in the best value determination was itself an error. The government cannot argue against prejudicial error by relying on a different prejudicial error as justification. Accordingly, ATSC meets its burden to demonstrate prejudice because, had the Navy properly regarded the two "Very Relevant" past performance entries, ATSC could have received a higher Factor 3 rating and, with such rating, ATSC would then clearly be superior to all other offerors in both Factor 3 and Factor 2. *See* Tab 173 at AR 6360 ("ATSC offers an overall superior approach in the non-cost/price factors due its superior approach in Factor 2."). Having a clear advantage in two of the non–cost evaluation factors, which were significantly more important than price, would certainly give ATSC an edge in competing for this contract. Such possibility squarely demonstrates a substantial chance of receiving the contract but for the Navy's error.

### 4. ATSC's Remaining Arguments Fail.

In addition to the above arguments, ATSC asserts four more reasons why the Navy's award to FSI cannot stand. Specifically, ATSC alleges that the Navy unreasonably based ATSC's "Satisfactory" confidence rating on two "cherry-picked" comments from a CPAR; that the Navy entirely disregarded the Factor 1 evaluation requirement of "experience to perform the entirety of the work" in its award of the contract; that the Navy irrationally evaluated and underrated ATSC's proposal under Factor 2 while simultaneously inflating FSI's proposal under that factor; and that the Navy irrationally evaluated FSI as "Outstanding" under Factor 1. ATSC has not met its burden of proof regarding any of these arguments. Nonetheless, the Court briefly discusses these arguments.

### a. The Navy Rationally Considered CPAR Comments in its Factor 3 Evaluation.

ATSC argues that the Navy unreasonably based ATSC's "Satisfactory Confidence" rating on "two cherry-picked comments" from a CPAR that are "inconsistent with the contents of the CPAR" and "*de minimis* in comparison to the successful performance reflected for ATSC." ECF No. 26 at 31. In response, the government states that "there is no evidence that ATSC's Satisfactory Confidence rating was the result of only these two CPARs comments" and that "past performance confidence ratings were based on an 'evaluation of the totality of each Offeror's past performance record and considering recency, relevancy, and quality assessments.'" ECF No. 32 at 39, 38 (quoting Tab 33 at AR 1222).

ATSC's argument fails because, to the extent the Navy relied on these comments in its Factor 3 evaluation, these two CPAR comments are by no means "cherry-picked," and the Navy's reliance on them is entirely rational given their subject matter. The first comment, documenting in a CPAR a "notable exception" to ATSC's otherwise " ██████ " performance of contract number ██████ , stated:



The Government recognized we missed citing required standards and policies for the site survey work but had relied on [ATSC] as the expert to follow those standards and policies.

Tab 170b at AR 6193. In short, the CPAR explains that it took ATSC four attempts to provide the government with contractually required data during ATSC's performance of a mobile surveillance contract. To the extent the Navy relied on this comment in rating ATSC's past performance, its reliance is entirely rational as this comment highlights ATSC's contract performance issues in a previous contract related to the contract at issue here.

Attempting to sidestep this conclusion, ATSC argues that "regarding the site survey report, **the CPAR actually reflects that it was a *Government error***—not an ATSC error. As the Government-prepared CPAR notes, the Government and ATSC worked together to solve an administrative issue with the site survey report where the Government 'recognized [it] missed citing required standards and policies for the site survey work.'" ECF No. 26 at 31 (alteration in original) (emphasis in original) (quoting Tab 170b at AR 6193). But this justification fails for two reasons. First, nowhere in the CPAR comment does the government state that the deficiency was the result of government error. The comment says that the government "missed citing required standards and policies for the site survey work *but had relied on [ATSC] as the expert to follow those standards and policies*." Tab 170b at AR 6193 (emphasis added). The government's reliance on ATSC to follow those standards and policies leads to the second reason why ATSC's argument fails: ATSC, as the contractor, was supposed to know the standards and policies set forth in its contract. Therefore, the deficiency noted in the CPAR comment was not caused by the government, and ATSC cannot circumvent responsibility for its previous contract performance by arguing that the performance issue was the government's fault.

The second "cherry-picked" comment, located in the same CPAR, states:

During this period of performance, the Government identified a significant concern and discussed it with [ATSC] on ██████ . Based on the Partner Nations[sic] concerns, the Government reminded [ATSC] of their relationship and

the lines of communication between [ATSC], their Subcontractors, the Partner Nation and the Government.



*Id.* at AR 6195. As should be abundantly clear, the Navy's concern with ATSC's direct communication with partner nations, without the Navy present, is entirely rational. The Court need not belabor the point that ATSC's ███████████████████████████████ could be a rational point of concern for the Navy in contracting with ATSC for future foreign military sales.

Because reliance on the two "cherry-picked" comments—highlighting performance issues and extra-contractual communications with foreign nations—would be entirely rational data points on which the Navy could rely in its Factor 3 evaluation, the Court declines ATSC's request to allow these unfavorable CPAR comments to fly under the radar.

### b. The Navy Did Not Disregard the Factor 1 Evaluation Requirement of "Experience to Perform the Entirety of the Work."

ATSC next argues that the Navy "irrationally assigned FSI's proposal the highest rating of 'Outstanding' for Factor 1" despite the "Factor 1 evaluation criteria requiring the Agency to assess the extent of the offeror's experience to perform the work and [] the Agency acknowledging FSI's lack of any relevant past performance experience" under Factor 3. ECF No. 26 at 21–22. The government observes in response that "Factors 1 and 3 consider different information contained in proposal volumes and are evaluated under different evaluation schemes"; therefore, the Navy could have rated FSI as "Outstanding" under Factor 1 while simultaneously finding that FSI lacked "relevant past performance experience" for the Factor 3 evaluation. *See* ECF No. 32 at 22, 23–26.

ATSC essentially contends that the Navy could not both rate FSI as "Outstanding" under Factor 1 and find FSI's past performance insufficient for a rating under Factor 3 because past performance is an evaluation factor under both Factor 1 and Factor 3. But, as the government notes, the solicitation makes clear that although Factors 1 and 3 each involve evaluation of an offeror's experience, the evaluations of experience in Factors 1 and 3 are of a different nature and quality. For example, under Factor 1, the Navy would "evaluate the Offeror's proposed

technical approach . . . to assess the extent to which the Offeror's proposal demonstrates an adequate approach, understanding, capabilities and experience to perform the entirety of the work under this solicitation." Tab 33 at AR 1221. In contrast, under Factor 3, the Navy would "evaluate each Offeror's demonstrated recent and relevant record of performance in supplying products and services that meet requirements of this contract." *Id.* Furthermore, whereas the Navy's Factor 1 evaluation would utilize an adjectival rating system reflecting an offeror's "understanding of the requirements," strengths, and "risk of unsuccessful performance," *id.* at AR 1225, the Navy's Factor 3 evaluation involved two separate scoring systems comprised of a relevancy of past performance rating and a performance confidence assessment, *id.* at AR 1226. The relevancy of past performance rating, as discussed above, would evaluate the offerors' past performance efforts against the scope, magnitude of effort, and complexities this solicitation required. *Id.* The performance confidence assessment would evaluate the extent to which the Navy expected that offerors would successfully perform the effort required by the solicitation. *Id.*

In other words, Factors 1 and 3 seek related information for different purposes. While Factor 1 utilizes an offeror's experience to assess whether an offeror can complete the tasks requested by the solicitation, Factor 3 utilizes an offeror's past performance to "determine how relevant the Offeror's recent efforts are to the requirements included in this solicitation" and "how well the Offeror performed on those relevant, recent contracts." *Id.* at AR 1221, 1222.

Here, the Navy found FSI's experience sufficient for an "Outstanding" rating under Factor 1. ATSC contends that this conclusion is irrational because the Navy acknowledged that FSI lacked "any relevant past performance experience" under Factor 3. ECF No. 26 at 21–22. ATSC's argument is that if FSI's past performance is insufficient for purpose A, it must be insufficient for purpose C as well. But if past performance is used for a different reason for purpose A than for purpose C, ATSC's logic does not follow. As explained above, the solicitation uses past performance for Factor 1 (purpose A) for a different reason than for Factor 3 (purpose C). For this reason, ATSC's erroneous equating of the different reasons for evaluating past performance under Factor 1 and Factor 3 is unpersuasive and its argument fails.

Even if the past performance evaluation for Factors 1 and 3 overlap as ATSC contends, the government argues that the SSEB determined that FSI's past performance capability "has merit" and is thus sufficient for an "Outstanding" rating under Factor 1. ECF No. 32 at 24; *see also id.* (citing Tab 171 at AR 6298). As the administrative record demonstrates, the SSEB justified FSI's "Outstanding" rating by citing that FSI "completed ▆ FMS projects across ▆ countries, managing requirements, design, surveys, integration, installations, and upgrades SOVT at over ▆ surveillance and C4I sites around the world." Tab 171 at AR 6298. Moreover, the Navy found that FSI's "proposed partnership with ▆▆▆▆▆▆▆▆▆ ▆▆▆ and their experience to achieve ATO [Authorization to Operate] for FMS based programs has merit and is advantageous to the Government because it will reduce the time to integrate GCCS-M [Global Command Control Systems—Maritime]." *Id*. at AR 6300. The SSEB further explained that "[FSI's] *experience* will reduce the lead time and administrative costs under the FMS case . . . The *use of an experienced team* that understands the ATO and cybersecurity requirements associated with integrating GCCS-M into NMSS will ensure seamless integration of GCCS-M into the NMSS." ECF No. 32 at 24 (emphasis in original) (quoting Tab 171 at AR

6300).  ATSC does not respond to this argument in its briefing and thereby waived any counterargument on this point.  *See Sarro & Assocs., Inc. v. United States*, 152 Fed. Cl. 44, 58–59 (2021).  Therefore, even if the evaluation of past performance overlaps between Factors 1 and 3, ATSC's argument still fails because the Navy expressly found FSI's past performance sufficient for an "Outstanding" rating, and the administrative record supports such a finding, for purposes of Factor 1.

### c.  The Navy Rationally Evaluated and Rated ATSC's Proposal Under Factor 2.

ATSC contends that the Navy "irrationally disregarded the experience component when evaluating offerors' proposals under Factor 2: Management," which was "contrary to the requirements of the Solicitation."  ECF No. 26 at 23.  Specifically, ATSC takes issue with the fact that the SSEB report did not discuss ATSC's ███ and ██████ contract but "praised" FSI's ████ and █████ contracts in its Factor 2 discussion.  *Id.* at 24–25.  In other words, ATSC appears to advance an unequal treatment theory regarding the Navy's Factor 2 analysis.

The government, in response, points to the SSEB's statement that "[e]lements of the proposal that the SSEB determined to meet the requirements of the solicitation are not identified in this report" and, therefore, "even if ATSC's experience with security cooperation environments was not explicitly mentioned in the SSEB report, such an omission would not indicate that it was not considered, but rather that it met the requirements of the solicitation."  ECF No. 32 at 26–27 (alteration in original) (first quoting Tab 171 at AR 6270).  The government adds that because "the administrative record demonstrates that the evaluators addressed both ATSC's and FSI's management proposals functionally the same way," ATSC's unequal treatment claim fails.  *See Id.* at 27.

As explained above, to demonstrate unequal treatment, a protestor must show that the agency unreasonably evaluated aspects of its proposal that were "substantively indistinguishable or nearly identical [to] those contained in other proposals."  *Off. Design Grp.*, 951 F.3d at 1372; *see also Ascendant Servs., LLC*, 160 Fed. Cl. at 289.  In the context of challenging an agency's past performance evaluation, mere disagreement with the agency's relevancy ratings cannot be the basis of a successful post-award challenge.  *Onésimus Def. LLC v. United States*, 173 Fed. Cl. 344, 354–56 (2024).

ATSC fails to demonstrate unequal treatment as there is essentially no difference in the Navy's evaluation of ATSC's and FSI's proposals under Factor 2.  For example, the Navy found two strengths for ATSC under Factor 2 because of its capability to station project managers in Egypt and ability to effectively communicate with subcontractors.  Tab 171 at AR 6289.  The Navy accordingly deemed ATSC's proposal "Good" under Factor 2.  *Id.*  Similarly, the Navy found one strength for FSI under Factor 2 because FSI's "past experience especially in ███ and █████ have provided lessons learned that will ensure cost efficiency, effective subcontractor oversight and risk mitigation when applied to this requirement."  *Id.* at AR 6304.  The two offerors received the same ratings and the Navy's rationale for assigning those ratings is nearly indistinguishable.  *Compare id.* at AR 6289 ("The clear lines of responsibilities, leadership engagement, and proven approach to use existing programs, plan, policies, and procedures has merit and is advantageous to the Government because [ATSC's] approach ensures

effective management of cost, schedule, and technical performance, which reduces performance risk."), *with id.* at AR 6304 ("[B]y utilizing designated experienced personnel who have previously managed . . . international projects, [FSI] will begin the project with enhanced experience with managing OCONUS activities as well as associated communications with PMW 740. This will likely result in schedule reductions by applying lessons learned and experience to this requirement.")

As the government puts it, "ATSC's claim that the evaluators 'failed to properly account' for its claimed experience while noting FSI's experience simply evinces ATSC's disagreement with the evaluators' conclusions." ECF No. 32 at 27. The Court concurs. ATSC's gripe with the fact that the Navy specifically mentioned FSI's ████ and ████ contracts by name, but failed to specifically mention ATSC's ████ and ████ contracts, boils down to mere disagreement with which words were used and not used in the Navy's Factor 2 discussion. Such mere disagreement cannot be the basis of a successful challenge. *Onésimus Def. LLC*, 173 Fed. Cl. at 357 ("'[M]ere disagreement with agency evaluations' does not demonstrate that the CO's findings were arbitrary and capricious." (quoting *Sci. Applications Int'l Corp. v. United States*, 108 Fed. Cl. 235, 248 (2012))). Accordingly, ATSC's disagreement with the Navy's words in explaining ATSC's and FSI's "Good" ratings under Factor 2 does not constitute unequal treatment.

### d. The Navy Did Not Err in Rating ATSC's or FSI's Factor 1 Technical Proposals.

Finally, ATSC argues that the Navy's award decision was erroneous because the Navy's 2024 and 2025 findings regarding FSI's Factor 1 submission significantly changed without explanation. ECF No. 26 at 19. Specifically, ATSC points out that, in August 2024, the Navy found ████ weaknesses in FSI's submission whereas in February 2025, the Navy found only two weaknesses in FSI's unchanged Factor 1 submission. *Id.* at 21. The Navy ultimately rated FSI's Factor 1 submission "Outstanding . . . the highest possible rating under the RFP's most important evaluation factor," which, ATSC argues, was irrational because the Navy did not explain why the number of weaknesses found in FSI's submission changed. *Id.* at 17 (emphasis omitted).

The government argues in response that the August 2024 scores are contained in "draft evaluation worksheets that *predate the SSEB by nine months*, and which were used as the basis for the competitive range determination" and not for final rating purposes. ECF No. 32 at 20–21. According to the government, "a list of ████ weaknesses on the draft worksheet that are not discussed in the final SSEB report [does not] constitute unexplained 'significant changes' to FSI's final rating in the SSEB report." *Id.* at 21.

As ATSC notes, in the Competitive Range Determination dated October 28, 2024, the Navy rated FSI's Factor 1 submission "████████ (with clarification, could be ████)," finding in total ████ strengths and ████ weaknesses. Tab 169c at AR 6118–19. In contrast, the SSEB, released in February 2025, rated FSI's Factor 1 submission "Outstanding," finding fifteen strengths and only two weaknesses. Tab 171 at AR 6298–303. But without more, ATSC's contention that a lack of explanation for a changed rating constitutes error is unavailing.

An agency may change its mind as it evaluates offerors' proposals so long as such changes are rational under the APA standard. But ATSC does not attack the rationality of removing any of the weaknesses by arguing that any of the originally assigned weaknesses were merited. Instead, ATSC simply argues that there is no explanation for the removal of ██ weaknesses. *See* ECF No. 26 at 21 ("The lack of ***any*** contemporaneous explanation regarding these changes . . . render the 'Outstanding' rating assigned to FSI arbitrary, capricious, and without a reasonable basis."). However, as the government points out, there is an explanation that is apparent from the record: the first evaluation of the proposals was not a final evaluation. In other words, this could be a mere difference of opinion from an initial evaluation to a final evaluation—a perfectly rational explanation. Without more from ATSC, this obvious rationale for the change stands. As FSI argues "[n]one of the ██ 'weaknesses' that ATSC complains were dropped from the final SSEB report qualified as 'weaknesses,' defined as a flaw in the proposal that increases the risk of unsuccessful contract performance." ECF No. 31 at 29 (citing Tab 33 at AR 1227). Although ATSC expends much effort in its briefing emphasizing the numbers—that FSI's Factor 1 submission had ██ weaknesses in 2024 and only ██ in 2025—ATSC offers no explanation as to why any of those ██ weaknesses should have been weaknesses under the solicitation's definition of that term in the first place. Because ATSC does not respond to FSI's argument that none of these ██ originally-assigned weaknesses should have been weaknesses in the first place, ATSC waives any such argument, *see Sarro & Assocs., Inc.*, 152 Fed. Cl. at 58–59, and also fails to counter the government's contention that the change is simply the result of the 2025 evaluation being the final evaluation.

Moreover, even if a change in FSI's number of weaknesses and Factor 1 rating without explanation could constitute error, as FSI correctly notes, the rating assigned to "ATSC's technical proposal also changed between the initial competitive range evaluation and final SSEB report." ECF No. 31 at 29. In the Competitive Range Determination, the Navy rated ATSC's Factor 1 submission "GOOD," finding ██ significant strength and ██ strengths. Tab 169b at AR 6117. However, in the SSEB report, the SSEB rated ATSC's Factor 1 submission "Outstanding," still finding ██ significant strength and ██ strengths. Tab 171 at AR 6286. Framing this issue in academic grading terms, ATSC essentially argues that FSI's Factor 1 submission received a "C" in the Competitive Range Determination and was upgraded to an "A" in the SSEB report without explanation. But, in actuality, FSI more accurately received a "B-" for its Factor 1 proposal in 2024—as FSI's Factor 1 proposal was rated "ACCEPTABLE (with clarification could be GOOD)," Tab 169c at AR 6118—and was later upgraded to an "A" in 2025. All the while, ATSC started with a "B" in 2024—with a rating of "GOOD," Tab 169b at AR 6117—and was also later given an "A" for its Factor 1 submission without the very explanation ATSC asserts was necessary to elevate FSI's grade.

As is now a well-settled proposition in this Court's jurisprudence, "[t]here has been no prejudice when a bid protestor benefited from the same potentially unlawful discretion from which the awardee benefited." *DigiFlight, Inc. v. United States*, 165 Fed. Cl. 588, 606 (2023) (quoting *G4S Secure Integration LLC v. United States*, No. 21-1817C, 2022 WL 211023, at *8 (Fed. Cl. Jan. 24, 2022), *appeal dismissed*, No. 2022-1513, 2023 WL 316142 (Fed. Cir. Jan. 19, 2023)). ATSC also received a higher Factor 1 rating in the 2025 SSEB report than it did in the 2024 Competitive Range Determination without explanation. Additionally, ATSC's rating jumped from "Good" to "Outstanding" even though the Navy's finding of ██ significant

strength and ▇▇ strengths in ATSC's Factor 1 proposal went unchanged.  ATSC can hardly complain that it suffered prejudicial error from an agency action that benefitted its proposal as well.

### 5.   Although ATSC Succeeds on the Merits, Injunctive Relief Is Not Appropriate Due to National Security Concerns.

ATSC moved the Court to permanently enjoin the award of the contract at issue to FSI. *See* ECF No. 26 at 33–35.  While the Court finds that ATSC is successful on the merits, the government cites numerous reasons why an injunction would affect ongoing national security concerns.  For this reason, the Court finds that injunctive relief is not warranted in this protest and instead will remand this matter to the agency to address the prejudicial errors it committed in its evaluation of past performance and its weighing of past performance in the best value determination.  The Court will first analyze ATSC's injunctive relief request before turning to its remand instructions.

### a.   Injunctive Relief Is Not Appropriate Here Because National Security Concerns Outweigh ATSC's Alleged Harms.

To determine whether a permanent injunction should issue, the Court employs a four-prong test: "(1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief."  *PGBA, LLC*, 389 F.3d at 1228–29.  "No one factor, taken individually, is necessarily dispositive.  If a[n] . . . injunction is granted by the trial court, the weakness of the showing regarding one factor may be overborne by the strength of the others."  *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).  Moreover, in considering whether to grant an injunction, the Court must be mindful that "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course."  *Apple, Inc. v. Samsung Elec. Co.*, 735 F.3d 1352, 1359 (Fed. Cir. 2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)).  Accordingly, "[i]f a less drastic remedy . . . [is] sufficient to redress [a plaintiff's] injury, no recourse to the additional and extraordinary relief of an injunction [is] warranted."  *Monsanto Co.*, 561 U.S. at 165–66.

Regarding prong 1 of the injunctive relief analysis, ATSC succeeds on the merits.  As explained above, ATSC successfully established that the Navy conducted a flawed best value tradeoff, irrationally deemed two of ATSC's past performance references "Not Relevant," and improperly disregarded the "Very Relevant" past performance reference of ATSC's proposed subcontractor.  For this reason, ATSC satisfies the first prong of the injunctive relief analysis.

For prong 2, ATSC has established that it will suffer "irreparable harm" if the Court withholds injunctive relief.  ATSC alleges that, without injunctive relief, it will "be deprived of the opportunity to compete fairly for the NMSS contract that it had a substantial chance of winning."  ECF No. 26 at 33.  As ATSC correctly notes, "[t]he Court of Federal Claims has repeatedly held that a protestor suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract."  *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 494

(2013); ECF No. 26 at 34. Therefore, ATSC has established that it will suffer irreparable harm absent injunctive relief and has satisfied the second prong of the injunctive relief analysis.

      With regard to prong 3, the government asserts that the balance of the hardships strongly disfavors injunctive relief because enjoining this contract would compromise national security operations in the Middle East. ECF No. 32 at 44–46. In response, ATSC argues that the government's "generalized claims about national security . . . fail[] to substantiate how correcting a flawed evaluation and re-issuing a proper source selection document would cause meaningful delay, let alone harm" in conducting such operations. ECF No. 35 at 29.

      In assessing requests for injunctive relief in bid protests, the Court is to give "due regard to the interests of national defense and national security and the need for expeditious resolution of the action." 28 U.S.C. § 1491(b)(3). Moreover, as the government correctly notes, the Supreme Court has underscored the "great deference" courts owe "to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)); *see also North Dakota v. United States*, 495 U.S. 423, 443 (1990) ("When the Court is confronted with questions relating to . . . military operations, we properly defer to the judgment of those who must lead our Armed Forces in battle.").

      Here, the government's asserted national security concerns trump the irreparable harm established by ATSC. In support of its argument against injunctive relief, the government filed the declaration of ██████████████████, the current ████████ ██████████████████. ECF No. 33 ¶ 2. In that declaration, ████████████, points to specific, serious national security concerns that may arise if the Court enjoins this contract. For example, according to ████████



      Based on these contentions, and classified information not discussed in this opinion, the Court finds that the government has asserted specific and credible threats to national security that tip the balance of the hardships caused by an injunction squarely in the government's favor. The government rarely comes before this Court with declarations of military officials to back its opposition to injunctive relief in Department of Defense–related procurements, let alone submits a declaration of a senior official within ████████████ containing classified information for that purpose. The fact that the government did so here further confirms the seriousness of the government's opposition to injunctive relief.

In response, ATSC argues that the government only proffered "generalized claims about national security to oppose injunctive relief" and that such claims fail to show why an injunction would harm the government's interests. *See* ECF No. 35 at 29–30. By offering such an argument, ATSC attempts to flip the burden of proof on the government to show why the Court should not grant injunctive relief. However, it is the protestor's burden to establish that injunctive relief is appropriate, not the other way around. *See, e.g.*, *Kingfisher Sys., Inc. v. United States*, 145 Fed. Cl. 22, 34 (2019) ("The protestor bears the burden of establishing the [injunctive relief] factors by a preponderance of the evidence."); *CGS-SPP Sec. Joint Venture v. United States*, 158 Fed. Cl. 120, 133 (2022) ("To obtain permanent injunctive relief, the plaintiff bears the burden of establishing four factors . . . ."); *Lab'y Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 654 (2014) ("Plaintiff has the burden of establishing the four [permanent injunction] factors by preponderant evidence.").

ATSC has not met its burden here. The Court would have expected ATSC to argue, for example, that because contract performance has not yet begun, an injunction would not delay this procurement. Instead, ATSC cites only the irreparable harm of its inability to compete fairly for the contract without substantively addressing the government's national security concerns.[8] While ATSC's harms are irreparable as a matter of law, the Court notes that ATSC's proffered harm—deprivation of the opportunity to compete for a contract it had a substantial chance of winning—is a garden-variety harm that most successful bid protestors face. ATSC offers no unique harms it would face without an injunction, such as risking financial insolvency, which might make a more compelling argument in the face of the government's serious national security concerns.

In sum, contrary to ATSC's contention that the government only proffered "generalized claims about national security," the government cites unique, specific national security concerns that could arise were the Court to enjoin performance of the contract at issue. In weighing the balance of the hardships, the allegations set forth in the government's five-page partially classified declaration outweigh the six sentences in ATSC's briefs devoted to discussing this prong of the injunctive relief analysis, especially when those six sentences do not substantively address the government's concerns. Therefore, the balance of the hardships weighs in the government's favor and ATSC has not satisfied the third prong of the injunctive relief analysis.

Turning to prong 4, ATSC's garden variety invocation of the principle that "the public interest is 'compromised whenever an agency abuses its discretion in evaluating a contractor's bid,'" is not enough to overcome the government's strong showing regarding national security. ECF No. 26 at 35 (quoting *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004)). As discussed above, ATSC's vague replies to the government's specific national security concerns are unpersuasive. *See Crowley Tech. Mgmt., Inc. v. United*

---

[8] Although ATSC attempted to address these national security concerns at oral argument, *see* ECF No. 41 at 80:14–81:2, such an attempt is too late, as ATSC should have confronted the government's allegations in its briefing. By failing to do so, its responsive arguments are deemed waived. *See Raytheon Co. v. United States*, 96 Fed. Cl. 548, 555 n.2 (2011) ("The court need not consider new arguments raised for the first time at oral argument.").

*States*, 123 Fed. Cl. 253, 267 (2015) ("[W]hen interests raise national security concerns they 'place the weight of both the public interest and balance of the hardships firmly on [the government's] side of the scale.'" (quoting *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 702–03 (2010))).

In sum, the Court finds that an injunction is not appropriate and therefore denies ATSC's request for such relief.

### b. The Court Remands the Navy's Decision to Explain its Rationale and Ambiguous Past Performance Rating Criteria.

"If the record before the agency does not support the agency action[ ] [or] if the agency has not considered all relevant factors . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *IAP Worldwide Servs., Inc. v. United States*, 160 Fed. Cl. 57, 82 (2022) (alterations in original) (emphasis omitted) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). A remand "is most useful when an agency retains some discretion with regard to the action it took in violation of the APA." *Id.* (quoting *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 24 (D.D.C. 2021)); *cf. Immigr. & Naturalization Serv. v. Orlando Ventura*, 537 U.S. 12, 16 (2002) ("[A] court . . . should remand a case to an agency for decision of a matter that statutes place primarily in agency hands."). Moreover, remand is specifically provided for in this Court's jurisdictional statute: "In *any* case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." 28 U.S.C. § 1491(a)(2) (emphasis added). And, as explained directly above, ATSC has failed to establish that it is entitled to injunctive relief; however, "remand—even if interpreted to include declaratory relief or accompanied by some limited instructions and bounded with deadlines—does not transform the relief into an injunction." *IAP Worldwide Servs.*, 160 Fed. Cl. at 81.

Here, "the grounds that the agency invoked when it took" the actions at issue in this bid protest were inadequate; therefore, the Court may "remand for the agency to do one of two things." *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (first quoting *Michigan*, 576 U.S. at 758). First, the agency can offer "a fuller explanation of the agency's reasoning at the time of agency action." *Id.* (emphasis omitted) (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990)). When the agency's initial explanation "'indicate[s] the determinative reason for the final action taken,' the agency may elaborate later on that reason (or reasons) but may not provide new ones." *Id.* at 21 (alternation in original) (quoting *Camp v. Pitts*, 411 U.S. 138, 143 (1973) (per curiam)). Second, in the alternative, "the agency can 'deal with the problem afresh' by taking new agency action." *Id.* (emphasis omitted) (quoting *Chenery Corp.*, 332 U.S. at 201).

### CONCLUSION

For the above reasons, pursuant to 28 U.S.C. § 1491(a)(2), (b)(2), and RCFC 52.2, the Court hereby **STAYS** and **REMANDS** this case to the Navy for up to **forty-five days** from the date of this opinion to address the issues identified above regarding the best value determination

and the evaluation of past performance (as it relates to the best value determination and with regard to the "Relevancy" rating issues discussed above and to the problems identified with the ATSC's past performance references). Specifically, the Navy **SHALL**, consistent with this opinion, either provide (1) "a fuller explanation of the agency's reasoning at the time of the agency action,"[9] or (2) render a new agency decision regarding:

1. The best value tradeoff between Neutral past performance ratings and other past performance ratings, such as a Satisfactory past performance rating;

2. The Factor 3 "Relevancy" rating criteria, including:

   a. Explaining the difference between a "Somewhat Relevant" and "Not Relevant" rating;

   b. Providing definitions of "scope" and "complexities this solicitation requires" in the context of the Factor 3 "Relevancy" evaluation; and

   c. Explaining in greater detail or issue new agency decisions regarding the ratings of the offeror's past performance references, including providing a rational basis for how "scope," "magnitude," and the "complexities this solicitation requires" affect the ratings an offeror received for each of its past performance references.

3. Past performances references, credit both ATSC's and ▮▮▮▮ FA873022C0017 contract past performance references or provide a fuller explanation as to why the fact that the two references come from the same contract should affect ATSC's past performance rating.

On or before the date that is **five days** after the Navy completes its decisions on remand, the government shall file a status report with the Court that includes with it the document(s) that contain the Navy's decision-making on remand.

On or before the date that is **fourteen days** after the government files the above status report, the parties shall file a joint status report, indicating whether there is a need for further proceedings in this case, and, if so, proposing a schedule for such proceedings or requesting a status conference with the Court.

The parties shall confer to determine agreed-to proposed redactions to this opinion. On or before July 11, 2025, the parties **SHALL** file a joint status report indicating their agreement on proposed redactions, attaching a copy of those pages of the Court's opinion that contain proposed redactions, with all proposed redactions clearly indicated.

---

[9] The Navy shall be mindful that "[t]his route has important limitations. When an agency's initial explanation 'indicate[s] the determinative reason for the final action taken,' the agency may elaborate later on that reason (or reasons) but may not provide new ones." *Regents*, 591 U.S. at 21 (alteration in original) (quoting *Camp*, 411 U.S. at 143).

Notwithstanding RCFC 52.2(b)(2), the Clerk of the Court need not serve this opinion and order on the Navy; rather, counsel for the United States **SHALL** provide a copy of this opinion and order to the cognizant contracting officer, which shall constitute service pursuant to that Rule.

**IT IS SO ORDERED**.

<u>s/ Zachary N. Somers</u>
Zachary N. Somers
Judge